The claimant based his claim for relief in the supreme court upon several grounds: First. That the arrangement of 11th July, 1838, was infected with usury; Second. That it was void for want of power in the American Life Insurance and Trust Company, under its charter, to issue the certificates of deposit mentioned in the pleadings and proofs; and Lastly. That the issuing of these certificates was, under the circumstances, a violation of the laws of this state relating to unauthorized banking. That court pronounced the judgment appealed from, on the assumption that the arrangement referred to was usurious, and that the plaintiff could be relieved against it in this action though he had not paid or offered to pay the sum really owing, without examining the other questions. It *Page 131 
will, therefore, be convenient to examine the case in reference to the alleged usury in the first instance.
It was well settled, prior to the enactment of the Revised Statutes, that a party, seeking in a court of equity to set aside a contract or conveyance on the ground of usury, was bound to pay or at least offer to pay the creditor the amount owing him, deducting the usurious premium. This was upon the ground that the principles of the court did not allow it to lend its aid to enforce a penalty or forfeiture — its jurisdiction being to relieve against such claims upon equitable considerations. A provision in the Revised Statutes dispensed with this condition, in favor of the borrower, where relief only without a discovery was sought. The usury act of 1837 went further, and provided that "whenever any borrower of money, goods or things in action, shall file a bill in chancery for relief or discovery, or both, against any violation of [the Revised Statutes respecting usury or] this act, it shall not be necessary for him to pay or offer to pay any interest or principal on the sum or thing loaned; nor shall any court of chancery require or compel the payment or deposit of the principal sum or interest, or any portion thereof, as a condition of granting relief or compelling a discovery to the borrower in any case of usurious loans forbidden by said title or by this act." (Laws of 1837, 487, § 4.) The question immediately arose, whether the dispensation thus provided for was limited to suits prosecuted literally by the borrower, or whether that term was used in a general sense to denote the party claiming to be aggrieved by the alleged usury; whether he was the original party to the loan or one representing him by privity of estate. The limited construction was finally adopted by the courts; and that construction has been established by the tribunal of last resort. (Post v. The President, c., of The Bank of Utica, 7 Hill,
391; Rexford v. Widger, 3 Barb. Ch. R., 640; S.C., 2Comst., 131.) If, therefore, Mr. Schermerhorn had sold his interest in the *Page 132 
lands in question to another, or, if his assignee in bankruptcy had disposed of his interest in them to any other person than Schermerhorn himself, the purchaser in either case could not have had relief except upon the condition of paying the sum really due, with legal interest. But the assignee in bankruptcy sold the estate in question to Schermerhorn, who was the borrower upon usury if there was an usurious loan; and hence it is argued by the counsel for the respondents, that as he answers the description of the party whom the act intended to favor, he is entitled to the benefit of the dispensation provided for such party. Under the same proceedings in bankruptcy Schermerhorn received a certificate and discharge from his debts, so that, although he was once a borrower, he is not now personally chargeable in consequence of such a relation. He sustains, moreover, the same relative situation towards the property that any other purchaser under him would have done. So far as there is any substantial distinction between the situation of a person who has mortgaged his own property for the payment of a loan, and one who has become the owner of such property by a conveyance from another mortgagor — Schermerhorn occupies the latter position. His title to the property is not at all affected (unless it be in the particular under consideration) by the fact that he was once before the owner of the same property. He is no way burthened with the debt which he seeks to avoid, except that if it constitutes a valid incumbrance upon the land, it impairs the value of his interest in it to the same extent, and in the same manner, in which it would have operated against any other purchaser under him. We are bound to assume, that the discrimination which the statute has made between the party to the loan and one who has purchased the property incumbered by a former owner, was based upon some substantial reason. It is the theory of the laws against usury that the borrower is under a species of moral duress, and hence his consent and coöperation in the illegal *Page 133 
transaction does not prejudice him. But one about to purchase property incumbered by an usurious lien is under no such coercion, but is as free to abstain from the purchase as to avoid entering into any other transaction. The defence of usury is not, however, personal to the borrower. As all contracts and conveyances infected with that vice are absolutely void, any person holding property apparently incumbered with such contracts and conveyances made by his predecessor in the title, may show the fact, upon which the law adjudges that the property is unaffected. When, however, the legislature came to provide new and increased facilities for establishing an allegation of usury, the remedy was given to the victim of the usury alone, to the exclusion of parties holding derivative titles under him. It may be safely affirmed that the motive for the discrimination was the supposed meritorious character of the former, as compared with the latter. The new remedy was extended to a party whose person and estate, or both, were burthened with an obligation which he had been coerced to create; and it was denied to all other parties, though according to the antecedent laws they were entitled to avoid liens upon their property by complying with the conditions which such laws imposed. The position occupied by Schermerhorn when he filed this bill was not the one contemplated by the legislature. Though he had been a borrower, he had divested himself in a manner authorized by law of all the consequences of that condition. His present relation to the property and to the litigation which was commenced by the bill was that of a volunteer purchaser of the subject of the litigation. His prior connection with the subject was altogether immaterial. His right would have been precisely the same if some other person had been the party to the arrangement of the 11th July, 1838, and if such person had become bankrupt, and the property had passed into the hands of the assignee, and Schermerhorn had purchased at the sale. Quoad the *Page 134 
debt, the property and the incumbrance, as they existed when the bill was filed, Schermerhorn was not a borrower, but a purchaser. In my judgment it would be as reasonable for one who was a borrower of the party, sued by a collateral contract not connected with the loan sought to be avoided, to claim the benefit of the statute, on the ground that he was literally a borrower, as for Schermerhorn, under the circumstances of this case to claim it. It may be said that he is within the letter of the act; but he is not at all within its spirit or intention.Qui hæret in litera hæret in cortice.
This view of the case was sought to be avoided by the complainant's counsel by the allegation that the proceedings in bankruptcy were coram non judice and void, because the petition in bankruptcy was not, as it was said, sworn to before an officer authorized by the laws of the United States to take affidavits; and I have been unable to find any act of congress authorizing clerks of courts to administer oaths out of court. As to oaths taken in court, it is well known that they are usually administered by the clerk or his deputy. The first order in the bankrupt proceeding which directs the publication of notice to show cause, and the order or decree of bankruptcy, both recite that the petition was duly verified. These orders were granted at the instance of the petitioner, and are some evidence against him that the verification was in all respects according to law. The deed to Schermerhorn recites the decree of bankruptcy, and the order appointing the assignee; and the defendants gave in evidence, in addition to the deed, certified copies of these orders. The fifteenth section of the bankrupt act provides "that such recital [in a deed executed by the assignee], together with a certified copy of such order, shall be full and complete evidence both of the bankruptcy and assignment therein recited." The defendants also gave in evidence the discharge of Schermerhorn from his debts. The fourth section of the act declares that *Page 135 
the certificate and discharge, when duly granted, shall be conclusive evidence in itself in favor of the bankrupt. I am of opinion, however, that any party may show that the district court did not obtain jurisdiction to make these orders; and that affirmative proof that the petition was not legally sworn to would be fatal to the proceedings. (Seaman v. Stoughton, 3Barb. Ch., 344; Ruckman v. Cowell, 1 Comst., 505, perBronson, J.) The only question then is, whether the jurats
attached to the petition and schedules afford sufficient evidence to overcome the presumption afforded by the deed and the several orders above mentioned. The language of the jurats, it must be admitted, is more appropriate to set forth an oath taken before a clerk alone than to a statement that the oath was taken in court. They do not, however, state positively that the oath was not taken in court. Knowing as we do that the clerk had no authority to administer an oath out of court, but that his power to administer one as the immediate officer of the court and in its presence was ample; that this oath was administered on the same day that the petition was presented, and that the court is declared to be always open, and applying the principle — ut resmagis valeat quam pereat — to this case, I am inclined to the opinion that it should be held that the papers were duly verified.
I will in the next place state briefly the conclusions of my mind upon the question of usury: First, the value of a pound sterling was not over estimated when it was received as equivalent to $4.71; but assuming that exchange was at par it was undervalued by about sixteen cents. An act of congress, passed in the year 1834 (4 U.S. Statutes at Large, 700), fixed the value of foreign, and among others of British gold coins, in federal money, by reference to the fineness of the gold and the weight. According to this authentic standard, which was in force when the transaction in question took place, the British sovereign, which is a coin representing a pound sterling is equivalent to about four dollars and eighty-seven *Page 136 
cents. (Treatise on Banking by J.W. Gilbert, General Manager ofthe London and Westminster Bank, 5 Heman's Banking Magazine,
902; 1 Hunt's Merch. Mag., 535, 6; 34 id., 345.) The difficulty which embarrassed the supreme court arose out of the early practice of considering a spanish silver dollar the equivalent of four shillings and sixpence sterling, and the act of congress of 1799 respecting the collection of duties on imports and tonnage, by which the pound sterling of Great Britain was required to be reckoned in the calculation of ad valorem
duties on imports at $4.44. (1 Story's Laws U.S., 226, 861.) The subject was further complicated, by calling the difference between the standard thus adopted and the real value of the pound sterling at any given time in our money, as a premium of exchange. Thus, when exchange on England is said to be 9 23/40 per cent. above par, it is really at par, for the addition of that amount per cent to $4.44 will produce the sum which precisely represents the value of the sovereign. If exchange rises still higher, it indicates that the balance of trade is against this country, and if the difference is sufficient to pay the expenses of exporting the precious metals, gold will be sent to England in preference to bills of exchange purchased at the current rate. If this was the only difficulty in the arrangement of July 11, 1838, it would cause no embarrassment. Second. But the certificates of deposit which Mr. Schermerhorn and his associates received bore an interest of only five per cent per annum, while they secured to the company an amount of money intended to be equivalent to the sum of English money represented by the aggregate of the certificates of deposit, with seven per cent interest. Then the certificates had twenty years to run, and assuming, as we must do, upon a question of usury, that our legal rate of interest represents the true value of the use of money, the associates would sacrifice the amount of the two per cent per annum, upon the whole sum of the certificates for each of the ensuing twenty years. When the transaction is really *Page 137 
a loan, and the borrower receives some security or promise to pay money instead of the money itself, the first question is whether the paper received calls for a sum equal to the amount which the borrower engages to pay. There is no difference in principle between a case where the security advanced by the lender is for a less nominal amount than the borrower's undertaking for repayment, and this case, where the difference is produced by an adjustment of the rate of interest. If one upon a negotiation for a loan gives his note for $1000 for the lender's note, upon which to raise money, for $800, the transaction is confessedly usurious; and it is not less so if the principal named in the security is equal, but the difference in the amount ultimately payable is produced by the insertion of different rates of interest in the two securities. It is upon this principle that the advance of post notes by the lender, the borrower undertaking to pay the same amount with legal interest, is usurious. (DryDock Bank v. The Amer. Ins. Co., 3 Comst., 361; N.Y. LifeIns. Co. v. Beebe, 3 Seld., 364.) There is, however, a principle upon which, in the case last supposed, the loan would be free from usury. If the paper advanced by the lender instead of money, has a fixed market value, it may, I think, be safely loaned at such value, though the money secured by it may be mathematically less than that which the lender agrees to pay. Such is the case with public stocks. They may be, and frequently are, worth more than par, though the interest which they bear is lower than the current rate of interest upon other securities, or than the legal rate. A holder of such stocks may legally advance them to a borrower upon the negotiation of a loan, at their market value, and take his obligation payable on time with legal interest; and so, I doubt not, an individual or corporation thus fortunately situated as to credit, may issue its own paper and receive security therefor payable on time for the market value of the paper thus issued. So in the case of an application bonafide made for *Page 138 
securities, payable at a future day for remittance or other lawful use, the transaction would not be objectionable though the arithmetical value of the paper thus purchased should be less than the obligation given to secure the payment, even if the last mentioned securities had no market value. In such case the object would not be to effect a loan, but to purchase exchange or the like. But in the absence of any such artificial or market value, and where the transaction is really a loan, and the borrower has bound himself to pay more money than the securities which he has received from the lender will oblige the latter to pay, the difference is an usurious premium. Without going over the evidence in this case, which, however, has been carefully examined, I am quite satisfied that the transaction between the associates and the Life and Trust Company was a loan by the latter to the former. The associates wanted money or something which would immediately produce money. They did not desire to purchase exchange or to procure an investment. The company had not indeed any ready money to loan, but they had credit, which enabled money to be raised on their engagements, and they consented to issue such engagements, upon being secured, by means of the difference of interest, considerably more than the amount which these engagements would require them to pay. Their credit, however, was not so good as that their paper of this description would command a premium in the market. On the contrary, it was considerably below par. They could not, therefore, loan such paper for more than its real value, and that value must be measured, as has been already stated, by the amount of money which it would oblige them to pay. I am, therefore, of opinion that the transaction of July, 1838, was void for usury; and if Schermerhorn could be considered as a borrower he would be entitled to relief against the securities executed to effect that arrangement, without the performance of any condition. *Page 139 
At the time the arrangement in question was consummated, the defendants' charter was embraced in the act of the general assembly of Maryland passed in December, 1837. The sixth section contains a limitation of the powers of the company, in these words: "This act shall not be construed to authorize the said company to issue for circulation as money, any of its own promissory notes, or notes in the nature of bank-notes, or certificates of deposit payable to bearer." The certificates issued in 1838, though not in terms payable to bearer, were such in effect. They were payable to the order of Mr. Thurston, an officer of the company, and endorsed by him in blank, so that they would pass by delivery. But it cannot be said that they were issued for circulation as money. The large amount of each certificate, the distant day at which they were payable, the fact that they bore interest and were payable in foreign money and in a foreign country, would entirely prevent them filling the place of currency. They resembled in their main features, so far as this question is concerned, public stocks more closely than circulating notes. They would, doubtless, answer some of the purposes of money, and so would state stocks or any other good bonds or securities, but they are quite destitute of the qualities which would fit them for circulation in the manner which money circulates. They were not, therefore, forbidden by the act of incorporation. The prohibition in the 4th section of the original act of incorporation, passed in 1833, was broader, and prohibited the company from issuing and putting in circulation any negotiable note. £ 12,000 of the certificates, which were eventually secured by the arrangement of 1838, were issued while the last mentioned act was in force. The issuing of them was a violation of the charter of the company. That charter however was not matter of municipal law with us. Its only effect was to regulate and define the power of the corporation, and when the company executed an act forbidden *Page 140 
by it, the result of the transaction in the view of the courts of this state would be that the act was without authority. When, however, this particular restriction was repealed by the new charter of December, 1837, it was competent for the parties who had received the benefit of the unauthorized certificates, to secure the company the amount agreed to be paid for them. These considerations have led me to the conclusion that the transaction in question is not invalid on account of the alleged violation of the charter of the company.
The 6th section of the title of the Revised Statutes relative to "unauthorized banking and the circulation of certain notes and evidences of debt issued by banks," declares that "no person or association of persons or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposits or discounting notes or bills, or issuing any evidences of debt to be loaned or put in circulation as money; nor shall they issue any bills or promissory notes or other evidences of debt as private bankers for the purpose of loaning them or putting them in circulation as money unless thereto specially authorized by law." (1 R.S.,
712.) This provision was modified by an act of 1837 (ch. 20), as to the business of receiving deposits and discounting bills, but the change did not affect foreign corporations. I am of opinion that the evidence establishes the position that all these certificates were issued for the purpose of being loaned as money by the corporation. It is not necessary that they should have been capable of circulating as money; it is enough to constitute an offence against the statutes that they should be issued to be loaned. The evidence of Mr. Seward shows that this was the object for which they were made and delivered, and the general scope of the arrangement corroborates this position. The bargain therefore in all its parts was a violation of the laws of this state. The executory stipulations of the several parties were consequently *Page 141 
void, and neither of them could maintain an action against any other party to compel a compliance with these stipulations.
It does not, however, follow, that any of the parties can sustain a suit in equity to rescind the arrangement or to set aside any of the deeds by which it was consummated. The parties were all participants in the transaction, and each is deemed to have consented to all the stipulations contained in the papers. It is manifestly impossible to discriminate in favor of those who were less actively engaged than the others. Those who took the more active part in the arrangement acted as the agents of the other parties, and notice to them is imputable to all the associates. It is an established principle of law that the courts will not entertain a suit to enforce an executory contract made in contravention of a statute of the state. If such a contract has been executed, an action will not lie in disaffirmance of it. In this class of cases the law will not extend its aid to either of the parties. It will not listen to their complaints against each other, but will leave them where their own acts have placed them. (Yates v. Foot, 12 John., 1; Nellis v. Clark, 20Wend., 27; S.C. in Error, 4 Hill, 424; Staples v.Gould, 5 Sandf. S.C.R., 411; S.C. in Court of Appeals, AprilTr., 1854; Talmadge v. Pell, 3 Seld., 328.) In this case Schermerhorn caused the title to the land in controversy to be conveyed to trustees for the benefit of the Life and Trust Company. That was an executed conveyance. If valid it operated, in connection with the papers constituting the defeasance, by way of mortgage, and vested a defeasable title in the trustees. The plaintiff seeks to disaffirm and rescind this conveyance and have the premises conveyed to him on the ground that it was part of a transaction entered into in violation of a statute of this state. The principle of law referred to is fatal to the suit in this aspect of it. *Page 142 
If the plaintiff was in a situation to avail himself of the act of 1837, respecting usury, I am of opinion that he would not be precluded from his remedy in that view of the case, by the consideration that the certificates were also a violation of the restraining act. The 5th section of the act of 1837, positively directs that where usury is shown, the usurious securities shall be set aside. It is not an answer to a prayer for relief under this provision that the particular transaction is illegal in other respects. It is said, that to sustain the judgment of the supreme court, we must go further than we are required by the terms of the section referred to. In my opinion, the statute should be construed more liberally or rather more reasonably than this objection assumes. Its object was effectually to relieve the party who had given usurious securities. To do this in the case before us, we must require the trustees to convey to the plaintiff the land which he has pledged for an usurious loan. The original proprietors have been paid the consideration money of the purchase, and nothing stands in the way of the plaintiff's enjoyment of the subject purchased, except the usurious arrangement by which that subject has been mortgaged to the Life and Trust Company. As to usury, the statute has abrogated the equitable maxim that the plaintiff, to entitle himself to relief, must do equity. He can now claim relief in cases within the act, without conforming to that maxim, and in such cases he should have the same full and ample remedy which he would have been entitled to if he had paid the real debt with legal interest.
If the plaintiff should be confined strictly to the case made by the complaint, the result of those views would be that the suit should be dismissed with costs, for the reason that no offer to pay anything is made by the plaintiff, and that he is not entitled to the benefit of the act of 1837. But, a majority of the court, while concurring substantially in the foregoing positions, are yet of the opinion that relief *Page 143 
may and should be granted to the plaintiff on condition of payment of the sum equitably due to the Life and Trust Company, or its assignees; and, in looking into the books, I find that courts of equity have been accustomed to grant relief in such cases upon equitable terms, though the bill contained no offer to pay the principal and legal interest. (Fanning v. Dunham, 5J.C.R., 122, 144, 146, and cases cited.) I concur, therefore, in that disposition of the case. The value of the certificates of deposit which were issued for the use of Schermerhorn must be ascertained by reference or otherwise, and, upon payment of that amount, the unsold land belonging to the complainant must be conveyed to the present plaintiffs. Should they neglect to make such payment within a period to be fixed by the decree, the complaint should be dismissed with costs. As the plaintiff did not intimate a willingness to submit to equitable terms until the argument of the appeal, he ought not to recover the costs of the litigation. The judgment will be settled before Judge Selden.
All the judges except MITCHELL, J., who was of opinion that the transaction was not usurious, and COMSTOCK, J., who took no part in the decision, concurred in the result of the foregoing opinions.
Judgment accordingly.